Weygandt, C. J.
 

 The first contention of the appellants is that the applicant, the H. & P. Trucking Company, is in fact a common carrier rather than a private or contract motor carrier.
 

 Under the provisions of Section 614-84, General Code, a common carrier by motor vehicle is defined as one engaged “in the business of transporting persons or property, or both, * * * for hire * * .* for the public in general, in or by motor propelled vehicles * * * over any public highway in this state * *
 

 In Section 614-103, General Code, a private or contract motor carrier is defined as one “engaged in the business of private carriage of persons or property, or both, * * * for hire, in or by motor propelled vehicles * *
 
 *
 
 over any public highway in this state * * *.”
 

 Hence, more precisely restated, the question is whether the applicant is engaged in the business of transporting persons or property for hire “for the public in general,” or is in the business of “private carriage.” The commission found in part that “said applicant has complied with the provisions of the law and the rules and regulations of the commission governing contract motor carriers * * *.” Does the record contain evidence tending to support this finding? The applicant has been operating its business
 
 *415
 
 ten or twelve years and now has thirty pieces of equipment. Before the granting of its present application the company already had similar contracts with nineteen other shippers. However, counsel are agreed that, although this total number of shippers is a relevant fact to be given due consideration, it alone is not decisive of this question.. The appellants -rely upon the decision of this court in the case of
 
 Breuer
 
 v.
 
 Public Utilities Commission,
 
 118 Ohio St., 95, 160 N. E., 623, the syllabus of which contains the following two pronouncements:
 

 “1. It is a question of law for the court to determine what constitutes a common carrier; but it is a question of fact whether one charged as a common carrier is within that definition and is carrying on his business in that capacity.
 

 “2. One who transports merchandise in motor vehicles over the highways of this state for hire and holds himself out to the public as being willing to serve the public indifferently to the limit of his capacity is a common carrier and subject to regulation as such though in each instance he makes a written contract before transporting the merchandise and refuses to carry for persons who are not responsible or who will not sign a written contract.”
 

 The following statement of fact appears in the opinion :
 

 “The testimony before the commission further developed that he would haul for any one who would sign a contract, and that he held himself out to serve the public indifferently, his only condition being that their credit standing was to be satisfactory.
 

 ‘ ‘ The contract which Breuer required his patrons to sign was by its terms stated to be a private contract of carriage. He agreed to hold himself in readiness to transport merchandise for any patron who would sign such contract, and to render prompt and efficient serv
 
 *416
 
 ice upon payment of a compensation, which was stated to be a certain price per hundred weight. The contract further provided that the patron should pay the compensation on the first day of each month after the rendition of the service. The contract lacked mutuality, inasmuch as the patron did not agree to do anything except to pay the compensation on the first day of each month for the service rendered during the preceding month. . The patron was, however, left free to either furnish merchandise for transportation or omit to do so. * * *
 

 “The decisive feature of the case is, as admitted by him, that he would enter into a contract with any responsible person for a single transaction to the limit of the capacity of his equipment.”
 

 The instant case presents no evidence of such subterfuge in an effort to evade the plain intendment of the statutes. No claim is made that this applicant has served any shipper not included in the permit granted by the commission. Nor, is there evidence that the applicant “would enter into a contract with any responsible person for a single transaction” or that it has held itself “out to serve the public indifferently,” its “only condition being that their credit standing was to be satisfactory.” It is true that new customers have been sought by the applicant, but there is no evidence tending to prove that this was done in bad faith with an intention to violate the terms of its permit by rendering service to a new shipper before duly securing the necessary authority from the commission. Under these circumstances the commission was not in error in holding that the applicant is in fact a private or contract carrier rather than a public one.
 

 The appellants’ second contention is that under the evidence in the record the granting of the application was against public interest; and again the question is whether there is a factual basis for the commission’s
 
 *417
 
 action. In solving this problem it is necessary to quote only the following testimony of one witness:
 

 “Q. And was this contract entered into because it tended to solve that inadequacy and that problem of transportation; was that the reason? A. Oh, yes, so it will help us materially.
 

 “Examifier Morgan: In what way?
 

 “The Witness: Deliveries and service at points of supply, where we have to get in material very quickly and also handle materials immediately when obliged to get their things — such as when you have to get an engine base delivered inside of five or six hours, you might say, to Cleveland, and the Cleveland Diesel plant. These people are in a position, if we tell them, they will take it right straight from our plant and set it on the dock of the Cleveland Diesel plant, should they expect it over in five or six hours. They give us fast service and thus take up the slack and detail that are occasioned by routine handling by common carriers, and then the volume of business we have, it makes it necessary for us — I will say conservatively our operations are such that we will ship over ten times —we will have to ship within the next days that much more in comparison with what we ship now, and we just have to get every means of transportation that can serve us to handle that — principally, on top of that, we require a great deal of special service in getting in tools and materials, and tools and materials are quite a problem, I can assure you. We require all the service we can possibly get to get in our tools and materials from Cleveland and other points, so we can keep our operations moving, and that critically handicaps us at times, so that I have many times — in fact, one of the reasons why I say I am still living in Cleveland ; I haven’t — I have had to use my car to go to pick up emergency materials; to go through wholesale houses and pick up emergency materials and bring
 
 *418
 
 them down to the plant in my own automobile. These things come up that need quick and immediate handling, over-night handling, if we possibly can, and that sort of service these people are in a position to furnish us.
 

 “Examiner Morgan: Say for instance you call the 3-C’s Highway or the common carrier operating between Cleveland and Warren, how soon could you get their service?
 

 “The Witness: You never can tell if you call upon the carrier; you never can tell, and many times we have had cases where it was just impossible to get even deliveries on several which were needed immediately. I recall this morning one particular case of some stuff which was brought down by common carrier to Warren and we needed delivery at our plant immediately. Well, our trucks weren’t able to handle it, and it should normally have been delivered by the common carriers, and the reason I remember it is that I okayed just • Saturday morning — I okayed bills for $18.00 for expenses we went through by having to send trucks over, not our trucks, over to the common carrier to get the material, and it was brought over to our plant so we could get it in shape and handle it that night foi; a railroad shipment in which it had to go out for the government. You see, in our business, we have to move stuff immediately.
 

 “Examiner Morgan: Was it necessary for you to send that truck over there to get this material?
 

 “The Witness: Yes, sir.
 

 “Examiner Morgan: When would you have gotten it if you hadn’t?
 

 “The Witness: I don’t know. We had got no date on it. They told us frankly they could not bring it .over.
 

 “Examiner Morgan: What carrier was it?
 

 •“The Witness: Motor Express.
 

 
 *419
 
 “Examiner Morgan: Have you had any other experiences similar to that recently?
 

 “The Witness: Well, I could not tell you offhand because there is so many things moving so fast in and ■out that it is hard to mention one particular case. I would not even have remembered that one if I hadn’t okayed the bill last Saturday. Those things are handled on the merits — when they come in we have to get .stuff in and out, and if we don’t we will be clogged, it will clog all other operations.
 

 “Q. (By Mr. Pilliod) Have you ever had occasion to haul any material yourself, personally? A. Oh, .yes, we sent our trucks after stuff we needed in a hurry.
 

 “Q. I mean in your own car. A. From Cleveland ■down?
 

 “Q. Yes. A. I have moved seven- or eight hundred pounds in the back of my car, lots of times.
 

 “Q. That is because you needed it for an immediate shipment? A. For instance, last Thursday night, .a week ago, I made a special trip to Cleveland — that is, we had a steel cutting saw which we had to get fixed, .and there was only one way to get it up there, that is, there was no carrier to pick it up at the time we wanted it, to have it fixed that night. It was to be brought back the next morning, which I did by taking it myself. The next morning that saw was going on things we were making for the government. We have to have as quick service as possible, because we have to have all that stuff shipped immediately.
 

 '“Q. Have you ever called the company — the two common carriers which are mentioned here, about the situation which you have just described, the inadequacy of service, in view of the expansion of these plants? A. Did I?
 

 • “Q. Yes, did you ever call that to their attention? A. We are continually checking up with them to get ;service on deliveries and find out where stuff is.
 

 
 *420
 
 “Q. And that has caused delays? A. That has caused delays and we needed the stuff badly.
 

 “Q. What answer did you get from them in connection with this? A. They would check it up and they always done all they could on that line, but that is not definite information; where the stuff is at.
 

 “Q. Would you say the delays continued? A. Pardon me?
 

 “Q. Would you say that those delays continued? A. Have they?
 

 “Q. Yes. A. Yes, and they will.
 

 “Examiner Morgan: How many trucks does your company have located at Warren?
 

 “The Witness: Three.
 

 “Examiner Morgan: Are they capable of taking care of these emergencies? .
 

 “The Witness: You mean our own trucks?
 

 “Examiner Morgan: Your own trucks.
 

 “The Witness: We own three trucks.
 

 “Examiner Morgan: Yes, and are these three trucks capable of handling emergency deliveries?
 

 “The Witness: Not at all times, no, sir.
 

 “Mr. Pilliod: You may cross examine.
 
 m
 
 * *
 

 “Q. If they don’t give you the service which is as good as or better than the common carrier, they would not get more than the 50 tons? A. That is pretty near the size of it. We are looking for someone to do our job, and if they cannot give us the service required, frankly, we will find someone who can. We are in here for service; we have to have it to keep that stuff moving, and we don’t like to have an admiral come down and ask us why it is not.
 

 "
 
 Q. Now, with reference to the actual tonnage, how much actual tonnage will there be, do you know? A. No.’
 

 “Q. It will be in excess of that — ’ A. Well, figure it out for yourself. We have 69 that will be turned
 
 *421
 
 ■out during the coming month, and if you will divide it up among the various carriers, 69 of these will weigh pretty close to eight tons; that is one piece.
 

 “Q. Now you say, ‘divided among other carriers’; .do you expect to use other carriers along with H. & P.? A. Anybody that can carry our goods where it has to .get to, and get it there, certainly.
 

 “Q. In other words, you want to use him as a fill-in? A. I don’t know if you can call it a fill-in. My wording of fill-in is the last resort. We expect to use them as long as they can handle our product in a good capacity.
 

 “Q. And you would use the other carriers also? A. Why cértainly. ’ ’
 

 The record discloses also that the applicant charges a somewhat lesser rate for its services.
 

 Under these circumstances it is apparent that the ■commission’s action is not without evidence to support it on the question of public interest.
 

 “The commission, being fully advised in the premi- “ commission made no finding as a basis for its decision.” In its journal the commission spoke in part as follows:
 

 “The commission, being fully advised in the premises, having considered the aforesaid record, together with all filings herein and made such independent inquiry and investigation as it deems necessary and proper, determines that the said applicant has complied with the provisions of the law and the rules and regulations of the commission governing contract motor carriers, and that such proposed amendment of said permit should be granted, it is, therefore * * V’
 

 While this finding is not a model in either form or substance, it is sufficiently definite to inform the parties in general terms as to the commission’s decision ■ on the issue before it.
 

 
 *422
 
 A careful study of the record fails to disclose that the order of the commission is'either unlawful or unreasonable. Hence, the order must be affirmed.
 

 Matthias, Hart, Zimmerman, Bell and Turner, JJ., concur.
 

 Williams, J., not participating.
 

 Order affirmed.